Artistic S. Inc. v. Lund, 2015 NCBC 109.

STATE OF NORTH CAROLINA

WAKE COUNTY

ARTISTIC SOUTHERN INC. d/b/a
SOUTHERN STAIRCASE,

          Plaintiff,

v.

ANDREW F. LUND; BRIAN C. KIRK;
JAMES A. LEWIS; VISION
STAIRWAYS & MILLWORK OF
RALEIGH LLC; and VISION
STAIRWAYS & MILLWORK LLC;

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 11789

ORDER AND OPINION

{1}    **THIS MATTER** is before the Court upon (i) Defendants Andrew F. Lund ("Lund"), James A. Lewis ("Lewis"), Vision Stairways & Millwork of Raleigh LLC ("Vision Raleigh"), and Vision Stairways & Millwork LLC's ("Vision Georgia") (collectively, the "Vision Defendants") Motion for Judgment on the Amended Pleadings (the "Motion for Judgment on the Pleadings"); (ii) Plaintiff Artistic Southern Inc. d/b/a Southern Staircase's ("Plaintiff") Motion for Partial Summary Judgment against Lund on its Claim for Civil Liability for Employee Theft and Embezzlement Pursuant to N.C. Gen. Stat. § 1-538.2 (the "Partial Summary Judgment Motion"); and (iii) Lund's Motion to Strike Plaintiff's Reply Brief and Accompanying Affidavit in support of the Partial Summary Judgment Motion (the "Motion to Strike") (collectively, the "Motions").

{2}    After considering the Motions, briefs in support of and in opposition to the Motions, supporting affidavits,[1] and the arguments of counsel contained in the transcript from the hearing held before this Court (Jolly, J.),[2] the Court **GRANTS in**

---

[1] The Court only considers the affidavits in connection with the Partial Summary Judgment Motion.

[2] Judge Jolly held a hearing on the Motion for Judgment on the Pleadings on July 30, 2013. The Partial Summary Judgment Motion and the Motion to Strike were filed after the hearing. The Court dispenses with a hearing on the Motions by consent of the parties and pursuant to Business Court Rule 15.4(a).

part and **DENIES in part** the Vision Defendants' Motion for Judgment on the Pleadings, **DENIES** Lund's Motion to Strike, and **GRANTS** Plaintiff's Partial Summary Judgment Motion.

*Fisher & Phillips, LLP, by J. Michael Honeycutt, for Plaintiff Artistic Southern Inc. d/b/a Southern Staircase.*

*Graebe Hanna & Sullivan, PLLC, by M. Todd Sullivan and Mark R. Sigmon, for Defendants Andrew F. Lund, James A. Lewis, Vision Stairways & Millwork of Raleigh LLC, and Vision Stairways & Millwork LLC.*

*Nexsen Pruet, PLLC, by C. Grainger Pierce., Jr., for Defendant Brian C. Kirk.*

Bledsoe, Judge.

I.

INTRODUCTION AND PROCEDURAL HISTORY

{3}   This case involves a former employer's claims against two former employees and two competitor companies arising out of alleged unfair competition.  The case was designated to the North Carolina Business Court, initially assigned to the Honorable Judge John R. Jolly, and subsequently reassigned to the undersigned.

{4}   Plaintiff originally filed this action against Defendants Lund, Brian C. Kirk ("Kirk"), and Vision Raleigh.  Plaintiff later amended its Complaint to include Lewis and Vision Georgia as Defendants.  Plaintiff's Amended Complaint includes claims against the various Defendants for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, misappropriation of trade secrets, computer trespass, conversion, unjust enrichment, civil conspiracy, tortious interference with contract and/or prospective contract or economic advantage, breach of fiduciary duty, fraud, breach of contract, piercing the corporate veil, and civil liability for theft by employee and embezzlement.

{5}   The Motions have been fully briefed and are now ripe for resolution.

II.

FACTUAL BACKGROUND

{6}   The Court does not make findings of fact on motions for judgment on the pleadings under Rule 12(c), *Erickson v. Starling*, 235 N.C. 643, 657, 71 S.E.2d 384,

394 (1952), or on motions for summary judgment under Rule 56, *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010). For purposes of the Vision Defendants' Motion for Judgment on the Pleadings, the Court merely summarizes the pleaded facts, giving all reasonable inferences to the non-moving party. *Erickson*, 235 N.C. at 657, 71 S.E.2d at 394. For purposes of Plaintiff's Partial Summary Judgment Motion, the Court "articulate[s] a summary of the material facts which [it] considers are not at issue and which justify entry of judgment," *Collier*, 204 N.C. App. at 161–62, 693 S.E.2d at 252, and therefore limits its recitation to the undisputed material facts necessary to decide the Partial Summary Judgment Motion.

{7} On October 10, 2001, Lund executed an employment agreement with Southern Staircase of North Carolina, Inc. ("SSNC") (the "Employment Agreement"), which included several post-employment restrictions, including restrictions on using or disclosing confidential information, and restrictions on soliciting customers, prospects, or employees. (Am. Compl. ¶ 25; Am. Compl. Ex. B, hereafter "Empl. Agr.".) The Employment Agreement also contained a duty of loyalty provision requiring Lund to "devote his entire working time, attention, and energies to the business of the Company, and . . . [to] not be engaged in any other business activity[,]" (Empl. Agr. ¶ 2), as well as a provision requiring Lund to return any company property pertaining to or containing trade secrets or confidential information, (Empl. Agr. ¶ 6). At the time of the execution of the Employment Agreement, SSNC was a wholly-owned subsidiary of Southern Staircase, Inc. ("SSI"). (Empl. Agr. ¶ 6.) Lund began working for SSNC on October 29, 2001 as an outside sales representative. (Am. Compl. ¶ 32.)

{8} In June 2009, SSI sold all or substantially all of its assets to Plaintiff. (Vision Defs.' Am. Countercls. ¶ 42; Pl.'s Answer to Am. Countercls. ¶ 42.) Plaintiff is a Delaware corporation engaged in the business of manufacturing, designing, and selling interior and exterior stair and handrail products for residential and commercial markets. (Am. Compl. ¶¶ 2, 13.)

{9}    In connection with this transfer, Gary A. Acinapura, the CEO of Artistic Holdings, Inc.,[3] sent a letter to "Vendors of Southern Staircase" stating in relevant part that "[Plaintiff] purchased only the assets of [SSI] and assumed none of their liabilities." Mr. Acinapura further stated: "I realize that [SSI] had outstanding trade balances with many of you however they are not the responsibility of [Plaintiff]." In addition, Mr. Acinapura declared that "[e]ssentially [SSNC] ceased to exist as an operating company [on June 5, 2009]." (Vision Defs.' Am. Countercls. ¶ 43; Pl.'s Answer to Am. Countercls. ¶ 43.) Plaintiff also repudiated and disclaimed any responsibility for an office lease previously held by SSNC and for truck leases previously held by SSNC. (Vision Defs.' Am. Countercls. ¶¶ 47–48; Pl.'s Answer to Am. Countercls. ¶¶ 47–48.)

{10}    Also in connection with this transfer, Lund's Employment Agreement with SSNC was assigned to Plaintiff. (Vision Defs.' Am. Countercls. ¶ 44; Pl.'s Answer to Am. Countercls. ¶ 44.) Lund completed new tax forms at the time of the transfer at Plaintiff's request. (Vision Defs.' Am. Countercls. ¶ 46; Pl.'s Answer to Am. Countercls. ¶ 46.) Plaintiff did not require any former employee of SSNC to sign an agreement restricting the employee's business activities, (Vision Defs.' Am. Countercls. ¶ 51; Pl.'s Answer to Am. Countercls. ¶ 51), and Lund did not enter into such an agreement with Plaintiff, (Vision Defs.' Am. Countercls. ¶ 50; Pl.'s Answer to Am. Countercls. ¶ 50).

{11}    Between June 2009 and April 2012, Plaintiff repeatedly changed Lund's compensation plan, resulting in a substantial reduction in Lund's pay. (Vision Defs.' Am. Countercls. ¶ 57; Pl.'s Answer to Am. Countercls. ¶ 57.) To address Lund's declining pay, Randy Scott ("Scott"), Plaintiff's President, offered Lund options to purchase Plaintiff's stock as part of a severance and non-competition agreement. Plaintiff first offered stock options to Lund in February 2012 and then again in March 2012. (Vision Defs.' Am. Countercls. ¶¶ 61–62; Pl.'s Answer to Am. Countercls. ¶¶

---

[3] Plaintiff is a subsidiary of Artistic Holdings, Inc. (Vision Defs. Am. Countercls. ¶ 41; Pl.'s Answer to Am. Countercls. ¶ 41.)

61–62.)  Lund did not accept either offer.  (Vision Defs.' Am. Countercls ¶¶ 61–62; Pl.'s Answer to Am. Countercls. ¶¶ 61–62.)

{12}  Vision Georgia is a direct competitor of Plaintiff.  (Am. Compl. ¶ 74.) Plaintiff alleges that in September or October, 2011, Defendant Lewis approached Lund about starting a business together in Raleigh to compete with Plaintiff.  (Am. Compl. ¶ 84.)  Plaintiff also alleges that around this time Lund began secretly utilizing Plaintiff's confidential information, trade secrets, property, and goodwill to divert business opportunities intended for Plaintiff to Vision Georgia.  (Am. Compl. ¶ 86.)

{13}  Lund incorporated Vision Raleigh on March 6, 2012, while he was still employed by Plaintiff as a sales representative.  (Am. Compl. ¶ 97.)  Plaintiff alleges that prior to that time, Vision Georgia had not openly marketed products or services in the Raleigh area, (Am. Compl. ¶ 75), but at all times thereafter, Vision Georgia and Vision Raleigh have marketed their products and services as one entity, (Am. Compl. ¶ 81).  Vision Raleigh and Vision Georgia are related companies with three common members.  (Am. Compl. ¶¶ 78–79; Vision Defs.' Answer to Am. Compl. ¶ 77.)

{14}  In April 2012, Lund notified Scott that he intended to resign and go to work for Vision Raleigh.  (Vision Defs.' Am. Countercls. ¶ 63; Pl.'s Answer to Am. Countercls. ¶ 62.)  Lund disclosed his plans and intentions regarding Vision Raleigh, and Scott thanked Lund for being honest about his plans and intentions, and for his contributions to Plaintiff.  (Vision Defs.' Am. Countercls. ¶ 64; Pl.'s Answer to Am. Countercls. ¶ 63.)  Scott asked Lund not to tell anyone else he was leaving Plaintiff's employ for a few weeks, and Lund complied.  (Vision Defs.' Am. Countercls. ¶ 64; Pl.'s Answer to Am. Countercls. ¶ 63.)  During this time, Scott asked Lund to work with Ken Hoffman, one of Plaintiff's managers, so that Plaintiff could collect amounts due on the customer accounts assigned to Lund and to transition Lund's ongoing business with these customers to other of Plaintiff's sales representatives.  (Vision Defs.' Am. Countercls. ¶ 66; Pl.'s Answer to Am. Countercls. ¶ 65.)

{15}  Plaintiff alleges that, as a result of these efforts to collect on Lund's accounts, Plaintiff learned that a number of customers had paid Lund individually

for products and services Plaintiff had supplied, (Am. Compl. ¶ 47), despite Plaintiff's policy and sales procedures that dictated that customer payments were to be made payable to Plaintiff at its corporate office, (Am. Compl. ¶ 48). Plaintiff further alleges that, between June 22, 2011 and February 23, 2012, Lund fraudulently billed many customers in excess of the amount of the purchase orders the customers had submitted to Plaintiff and kept the difference for himself when he accepted payment directly from the customers. (Am. Compl. ¶¶ 51–64.) There is undisputed evidence that Lund misappropriated payments from six different customers that were intended to cover invoices for products and services provided by Plaintiff. (Lund Dep. 57:6–59:9, Jan. 8, 2013; Scott Aff., hereafter "First Scott Aff.", ¶¶ 6–11, Oct. 30, 2014.)

{16}     Plaintiff also alleges that, on numerous occasions between April 2011 and February 1, 2012, Lund obtained work and sales through his position with Plaintiff as a result of Plaintiff's marketing, advertising, customer goodwill, and confidential information. Plaintiff further alleges that Lund directed such work and sales to other entities, bypassing Plaintiff, and, as a result, directly received a portion of the proceeds of those sales. (Am. Compl. ¶¶ 62–73.)

III.

VISION DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

A.     Legal Standard

{17}     "A motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain. When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974) (citation omitted). "'A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant[.]'" *Bigelow v. Town of Chapel Hill*, __, N.C. App. __, __, 745 S.E.2d 316, 319 (2013) (quoting *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990)). The Court may only consider "the pleadings and exhibits which are attached and incorporated into the pleadings." *Davis v. Durham Mental Health/Dev.*

*Disabilities/Substance Abuse Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004) (internal quotation marks and citation omitted). The Court must "view the facts and permissible inferences in the light most favorable to the nonmoving party." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. Thus, a Rule 12(c) motion for judgment on the pleadings should be denied "unless it is clear that plaintiff is not entitled to any relief under any statement of the facts." *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC LEXIS 5, at *8 (N.C. Super. Ct. May 26, 1999).

B.    <u>Analysis</u>

{18}    In the Motion for Judgment on the Pleadings, the Vision Defendants seek entry of judgment on (i) Plaintiff's breach of contract claims against Lund (claims for relief eight, nine, ten, eleven, twelve, and thirteen); (ii) Plaintiff's claim for tortious interference with contract and prospective economic advantage against all Vision Defendants (claim for relief sixteen); (iii) Plaintiff's fraud claim against Lund (claim for relief fifteen); (iv) Plaintiff's breach of fiduciary duty claim against Lund (claim for relief fourteen); (v) Plaintiff's misappropriation of trade secrets claim against all Vision Defendants (claim for relief three); and (vi) Plaintiff's unfair and deceptive trade practices claim against Lund (claim for relief two)[4]. The Vision Defendants do not move for dismissal of Plaintiff's claims for civil liability for theft by employee/embezzlement (claim for relief one), computer trespass (claim for relief four), conversion (claim for relief five), unjust enrichment (claim for relief six), civil conspiracy (claim for relief seven), and piercing the corporate veil (claim for relief seventeen).

i.    <u>Breach of Contract</u>

{19}    The Court first addresses the Vision Defendants' Motion for Judgment on the Pleadings on Plaintiff's breach of contract claims against Lund.[5] Judgment on

---

[4] Plaintiff's claim for unfair and deceptive trade practices is asserted against all Defendants, but the Vision Defendants' Motion for Judgment on the Pleadings only seeks entry of judgment as to Plaintiff's unfair trade practices claim against Lund.

[5] The parties assume, and thus the Court assumes without deciding, for the purposes of resolving the present Motion that the Employment Agreement entered into between Lund and SSNC was validly assigned to Plaintiff as part of Plaintiff's purchase of SSNC's assets in June 2009.

the pleadings on a breach of contract claim may be appropriate "where the court can construe the plain and unambiguous language of [the] contract to determine if it has been breached." *Praxair*, 1999 NCBC LEXIS 5, at *8 (citing *DeTorre v. Shell Oil Co.*, 84 N.C. App. 501, 504, 353 S.E.2d 269, 272 (1987)).  Here, Plaintiff alleges that Lund breached six separate provisions of the Employment Agreement: a covenant not to solicit customers, (Empl. Agr. ¶ 7), a covenant not to solicit prospective customers, (Empl. Agr. ¶ 8), a covenant not to solicit employees, (Empl. Agr. ¶ 9), a covenant not to disclose trade secrets or confidential information, (Empl. Agr. ¶ 6), a duty of loyalty agreement, (Empl. Agr. ¶ 2), and a return of property agreement, (Empl. Agr. ¶ 6). The covenants not to solicit customers, prospective customers, or employees restricted Lund for one year after his termination from employment, and the covenant not to disclose confidential information restricted Lund for two years after his employment ended.  The covenant not to disclose trade secrets, the duty of loyalty provision, and the return of property provision did not contain an express time limitation.

{20}    Lund argues that, under North Carolina law, his employment under the Employment Agreement was terminated on the date of the asset sale, i.e., in June 2009.  As a result, Lund contends that the one- and two-year post-employment restrictions expired in June 2010 and June 2011, respectively.  Lund posits that Plaintiff's breach of contract claims must be dismissed because Plaintiff does not allege that Lund breached the time-limited provisions during their effective periods. Plaintiff argues in response that it has pleaded that Lund's termination did not occur until Lund's resignation in April 2012 and that the date of Lund's termination under the Employment Agreement is a factual question that may not be resolved on the Vision Defendants' Motion under Rule 12(c).

{21}    The North Carolina courts have held that the acquisition of another company through an asset purchase – as opposed to a purchase of ownership interests – terminates the seller's existing employment relationships.  *See, e.g.*, *Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 597, 632 S.E.2d 563, 571 (2006) (noting that, in an asset sale, an offer of employment to the seller's employees is an offer of new employment); *Covenant Equip. Corp. v. Forklift Pro, Inc.*, 2008 NCBC LEXIS 12,

at *25 (N.C. Super. Ct. May 1, 2008) (Tennille, J.) (recognizing that an asset sale terminates employment relationships on the date of the asset sale)[6]; *see also AmeriGas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *12–13 (N.C. Super. Ct. Oct. 15, 2015) ("[A]cquisition of another company by asset purchase will act as a termination of existing employment relationships, and existing employees of the acquired business do not necessarily become employees of the acquiring entity.").

{22}  This Court has therefore held that "when an employer sells its assets, including its right to enforce a restrictive covenant in an employment contract, the period of the restrictive covenant begins to run because the employment relationship has been terminated." *Better Bus. Forms & Prods., Inc. v. Craver*, 2007 NCBC LEXIS 34, at *21 (N.C. Super. Ct. Nov. 1, 2007) (Tennille, J.). *See also Covenant*, 2008 NCBC LEXIS 12, at *24–25 ("[T]he buyer of a noncompetition agreement does not step fully into the shoes of the original employer because the buyer is a new employer. Instead, the buyer can either enforce the noncompetition agreement or enter into a new noncompetition agreement."). Thus, "a noncompetition agreement that has been sold as part of an asset sale . . . gives the buyer the right to enforce the noncompetition agreement as of the date of the sale but not to enforce the noncompetition agreement as if it had been entered into originally by the buyer." *Id.* at *24.

{23}  The facts pleaded here establish that Plaintiff purchased substantially all of SSNC's assets in June 2009. As a result, Lund's employment under the Employment Agreement was terminated at that time as a matter of North Carolina law, and the time periods for the post-employment restrictions in the Employment Agreement began to run. As *Craver* and *Covenant* make clear, Plaintiff had the option of either enforcing the restrictions as of the date of the asset sale or entering into a new agreement with Lund. Although Plaintiff attempted to negotiate an agreement with Lund containing new post-employment restrictions, Lund never agreed to any such restrictions. Plaintiff therefore was left with the right to enforce

---

[6] Although the employment contract at issue in *Covenant* was governed by South Carolina law, the Court found that the South Carolina courts did not offer guidance on the assignability of noncompetition agreements, and the Court therefore relied on North Carolina law in its analysis. *Id.*

the post-employment restrictions contained in Lund's Employment Agreement with SSNC.

{24} Based on Lund's June 2009 termination, the one-year prohibition on Lund's solicitation of customers, prospects, and employees expired in June 2010. Because Plaintiff alleges that Lund's purported breach of these restrictions did not occur, at the earliest, until April 2011, Plaintiff's claims for alleged breach of these restrictions should therefore be dismissed.

{25} The two-year prohibition on Lund's use or disclosure of confidential information, however, did not expire until June 2011. Reading Plaintiff's Complaint liberally, Plaintiff has alleged that Lund breached this provision in April, May, and June 2011 by using Plaintiff's confidential information in carrying out Lund's alleged embezzlement and in obtaining work and sales. (*See* Am. Compl. ¶¶ 50, 51, 60, 64, 65, 66.) Accordingly, Plaintiff's claim for breach of the covenant not to disclose confidential information should survive the Vision Defendants' Motion.

{26} The Court next turns to the covenant not to disclose trade secrets, the duty of loyalty provision, and the return of property provision, each of which is not expressly limited in duration. Plaintiff contends that these provisions serve to protect Plaintiff's rights arising after the asset sale – in particular, to protect Plaintiff's trade secrets disclosed or property provided to Lund by Plaintiff, or to bind Lund to a contractual duty of loyalty during Lund's employment with Plaintiff. The Court disagrees.

{27} When Plaintiff acquired SSNC's assets, Plaintiff acquired the right to enforce the Employment Agreement against Lund. *Craver* and *Covenant* make clear, however, that the rights Plaintiff acquired in this regard were SSNC's rights as they existed at the time of the asset sale – not rights that related to Lund's subsequent employment with Plaintiff. In short, Plaintiff could only buy what SSNC could sell – and that only included SSNC's rights under the Employment Agreement at the time of sale. Accordingly, the Court concludes that, consistent with *Craver* and *Covenant*, Plaintiff may enforce the covenant not to disclose trade secrets, the duty of loyalty

provision, and the return of property provision against Lund to the extent SSNC could have enforced these same provisions against Lund on the date of the asset sale.

{28} With this conclusion in mind, the Court next examines whether Plaintiff's claims for breach of these three provisions survive the Vision Defendants' Motion.

{29} First, the covenant not to disclose trade secrets provides that Lund "will not directly or indirectly (a) during the term of this Agreement or at any time thereafter, disclose . . . , use, or otherwise exploit for his own benefit or the benefit of another . . . any Trade Secrets . . . ." (Empl. Agr. ¶ 6.) As noted above, Plaintiff acquired the right to enforce this provision to the extent of SSNC's rights as of the date of the asset sale in June 2009; Plaintiff did not acquire a contract right against Lund protecting from disclosure any of Plaintiff's trade secrets disclosed to Lund after the asset sale. Plaintiff has not alleged that Lund used or disclosed at any time any of SSNC's trade secrets that were disclosed to Lund prior to June 2009. As a result, the Court concludes that Plaintiff has failed to allege an actionable breach of the covenant not to disclose Plaintiff's trade secrets. Accordingly, Plaintiff's breach of contract claim on this basis should be dismissed.

{30} Next, the duty of loyalty provision provides that "[Lund] shall devote his entire working time, attention, and energies to the business of the Company, and [Lund] shall not be engaged in any other business activity." (Empl. Agr. ¶ 2.) Because Lund's employment terminated as a matter of law in June 2009, any breach of this provision must have occurred prior to that time. Plaintiff, however, has not alleged any breach of this provision prior to June 2009. The Court therefore concludes that this claim should also be dismissed.

{31} Finally, the return of property provision provides that "[u]pon the effective date of the termination of [Lund's] employment under this Agreement or at any other time, [Lund] will promptly deliver to the Company, all originals and copies of all papers, data, files, and other documents and media pertaining to or containing . . . Trade Secrets or Confidential Information . . . ." (Empl. Agr. ¶ 6.) Although this provision potentially allows Plaintiff to enforce Lund's obligation to return SSNC property "at any . . . time," Plaintiff has failed to allege that the property Lund failed

to return was SSNC property that Lund possessed when his employment was terminated in June 2009. The Court therefore concludes that this claim should also be dismissed.

{32} Based on the above, the Court concludes that the Vision Defendants' Motion for Judgment on the Pleadings should be granted as to Plaintiff's claims for relief eight, ten, eleven, twelve, and thirteen and that these claims should be dismissed with prejudice. The Court further concludes that Plaintiff has stated a claim for relief for breach of the covenant not to disclose confidential information and therefore that the Vision Defendants' Motion should be denied as to Plaintiff's claim for relief nine.

ii. <u>Tort Claims</u>

{33} The Court next addresses Plaintiff's tort claims. First, the Vision Defendants contend that some of Plaintiff's tort claims – specifically Plaintiff's claims for tortious interference with contract and prospective economic advantage, fraud, and unfair and deceptive trade practices – are barred by the economic loss doctrine because these claims are not independent from Plaintiff's underlying breach of contract claims. Plaintiff asserts in response that (i) the economic loss doctrine is inapplicable to Plaintiff's tort claims against Vision Raleigh and Vision Georgia because there is no privity of contract between Plaintiff and either Vision entity, and (ii) if, as Lund contends, the Employment Agreement expired in June 2009, Lund cannot rely on the economic loss doctrine to preclude tort claims against him that arose after the Employment Agreement expired.

a. <u>The Economic Loss Doctrine</u>

{34} The "economic loss rule" originated in the products liability context to prohibit recovery in tort from a seller for purely economic loss arising out of a defective product. *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986) (holding that no products liability claim lies where the only injury claimed is economic loss); *see also 2000 Watermark Assoc. v. Celotex Corp.*, 784 F.2d 1183, 1185 (4th Cir. 1986) (noting that "economic losses are not ordinarily recoverable under tort law"). North Carolina expressly adopted the economic loss rule in

*Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 391 S.E.2d 211, *rev. denied*, 327 N.C. 426, 395  (1990), stating that

> [o]ur state courts have not decided whether, in the context of a products liability suit, purely economic losses can be recovered in an action for negligence.  [However, t]he majority of courts which have considered this question have held that purely economic losses are not ordinarily recoverable under tort law.  We adopt this rule . . . .

*Id.* at 432, S.E.2d at 217 (citing *2000 Watermark*, 784 F.2d at 1185).

{35}     The Fourth Circuit has explained the rationale supporting the rule as a recognition that while "[c]ontract law permits the parties to negotiate the allocation of risk[,] . . . [n]o such freedom is available under tort law, which assigns risk as a matter of law." *2000 Watermark*, 784 F.2d at 1185–86.  Because the "lack of freedom [to negotiate the allocation of risk] seems harsh in the context of a commercial transaction . . . the majority of courts have required that there be injury to person or property before imposing tort liability." *Id.* at 1186.

{36}   Although the economic loss rule was not adopted in North Carolina until 1990, North Carolina courts had previously and broadly recognized that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *North Carolina Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978); *see also Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976) (the general rule in North Carolina is that "punitive or exemplary damages are not allowed for breach of contract").  Thus, it has long been the law in North Carolina that a tort action cannot lie against a promisor "for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill."[7] *Ports Auth.*, 294 N.C. at 83, 240 S.E.2d at 351; *see also Spillman v.*

---

[7] The Supreme Court in *Ports Authority* recognized four general, nonexclusive situations where a promisor may be liable in tort for personal injury or damage to property proximately caused by the promisor's negligence or willfulness:

> (1) The injury . . . was an injury to the person or property of someone other than the promisee.
> (2) The injury . . . was to the property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.

*Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992) ("[A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.").

{37} More recently, our courts have used the *Ports Authority* line of decisions to apply the economic loss rule outside the products liability context as a more general "limitation[] on the recovery in tort when a contract exists between the parties that defines the standard of conduct and which the courts believe should set the measure of recovery." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *47–48 (N.C. Super. Ct. Nov. 3, 2011). Thus, the rule has developed in North Carolina that "[o]nly where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." *Strum v. Exxon Co., USA*, 15 F.3d 327, 330 (4th Cir. 1994) (applying North Carolina law and citing *Newton*, 291 N.C. at 111–12, 229 S.E.2d at 301 and *Asheville Contracting Co. v. City of Wilson*, 62 N.C. App. 329, 342, 303 S.E.2d 365, 373 (1983)). Moreover, "[t]he independent tort must be 'identifiable'" to sustain a claim. *Id.* at 331. Simply stated, "[t]o state a viable claim in tort for conduct that is also alleged to be a breach of contract, 'a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract.'" *Akzo Nobel*, 2011 NCBC LEXIS 42, at *48 (quoting *Kelly v. Georgia Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)).[8]

---

(3) The injury . . . was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.
(4) The injury . . . was a willful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Ports Auth.*, 294 N.C. at 82, 240 S.E.2d at 350–51 (internal citations omitted).

[8] Federal courts applying North Carolina law have often additionally required that "the tort must be accompanied by some element of aggravation, such as fraud, malice, reckless indifference, oppression, insult, [or] willfulness." *N.C. Mut. Life Ins. Co. v. McKinley Fin. Servs.*, No. 1:03CV00911, 2005 U.S. Dist. LEXIS 36308, at *27 (M.D.N.C. Dec. 22, 2005) (citing *Taha v. Thompson*, 120 N.C. App. 697, 463 S.E.2d, 553, 558 (1995)). *See, e.g.*, *Strum*, 15 F.3d at 331; *Schumacher Immobilien Und Beteiligungs*

{38}  The Vision Defendants argue that Plaintiff's claims for tortious interference with contract and prospective economic advantage, fraud, and unfair and deceptive trade practices derive from Plaintiff's obligations under the Employment Agreement and thus should be barred as a matter of law.  The Vision Defendants ignore, however, that most of Plaintiff's contract obligations ended in June 2009, others in June 2010 and June 2011, and some may continue today.  The policy behind the economic loss rule is that "the open-ended nature of tort damages should not distort bargained-for contractual terms." *Id.* at \*49 (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998)).  That policy is not served by barring tort claims based on conduct occurring when "bargained-for contractual terms" are no longer in effect; i.e., when there is no present contractual duty at the time of the alleged conduct.  In light of the foregoing, the Court assesses the impact of the economic loss rule on the survivability of Plaintiff's tort claims separately, in the context of its discussion of the relevant claim.

b.      Tortious Interference with Contract and/or Prospective Economic Advantage

{39}  Plaintiff's tortious interference claim is pleaded as a single claim against all Defendants for "Tortious Interference with Contract and/or Prospective Contract or Economic Advantage."  The Court construes the Amended Complaint as alleging that: (1) all Vision Defendants tortiously interfered with Defendant Kirk's contractual obligations to Plaintiff; (2) Vision Raleigh, Vision Georgia, and Lewis tortiously interfered with Lund's contractual obligations to Plaintiff; and (3) all Vision Defendants tortiously interfered with Plaintiff's prospective contracts or business relations.

{40}  For a tortious interference with contract claim to withstand a motion for judgment on the pleadings, a plaintiff must allege:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of that contract; (3) the defendant intentionally

*AG v. Prova, Inc.*, No. 1:09cv00018, 2010 U.S. Dist. LEXIS 107526, at \*4–5 (M.D.N.C. Oct. 7, 2010) ("The tort also must have an aggravating element . . . ."); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2011 U.S. Dist. LEXIS 31039, at \*17 (E.D.N.C. Jan. 25, 2011) (same).

induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

{41} Similarly, "to state a claim for wrongful interference with prospective advantage, the plaintiff[] must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (citation omitted). "[I]t is sufficient for a party to state a claim for interference with 'relations' or 'business relations' when referring to interference with existing contracts or the prospective likelihood of future contracts." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at *29 (N.C. Super. Ct. July 10, 2002).

{42} The Court first addresses Plaintiff's claim that the Vision Defendants tortiously interfered with Defendant Kirk's employment agreement.[9] Plaintiff alleges that Kirk breached the duty of loyalty provision, the confidentiality and non-disclosure covenant, and the return of property provision in his employment agreement, all of which are identical to the same provisions in Lund's Employment Agreement.[10] Like Lund, Kirk's employment relationship was terminated in June 2009, on the date of the asset sale. Also as with Lund, Kirk's duty of loyalty provision expired with the termination of his employment in June 2009, and his confidentiality and non-disclosure provision expired in June 2011, two years after his employment termination.

---

[9] The Court notes that Kirk has not moved for judgment on the pleadings as to Plaintiff's breach of contract claims against him. Nonetheless, in order for Plaintiff to have stated a valid claim against the Vision Defendants for tortious interference with Kirk's employment agreement, the Court must initially determine whether Plaintiff has alleged a valid claim for breach of contract against Kirk. *See Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 512, 740 S.E.2d 923, 928 (2013) (holding that an unenforceable contract cannot support a claim for tortious interference with contract).

[10] As with Lund's Employment Agreement, Kirk originally entered into his employment agreement with SSNC. Also as with Lund, the parties assume, and the Court similarly assumes without deciding, for the purposes of the present Motion, that Kirk's employment agreement was also validly assigned to Plaintiff as part of Plaintiff's purchase of SSNC's assets.

{43} Plaintiff, however, alleges that Kirk first breached his employment agreement "[j]ust prior to his resignation," (*see* Am. Compl. ¶¶ 106–07), which Plaintiff alleges occurred on May 28, 2012, (Am. Compl. ¶ 103). Thus, Plaintiff fails to allege that Kirk breached any of the time-limited provisions in his employment agreement when they were in effect. In addition, as with Lund, Plaintiff fails to allege that Kirk's alleged breach of the return of the property provision involved SSNC property that Kirk possessed when his employment with SSNC was terminated in June 2009. Accordingly, because Plaintiff has failed to allege that Kirk breached an enforceable contract, Plaintiff's claim that the Vision Defendants tortiously interfered with Kirk's contract must fail.[11] *See Phelps Staffing*, 226 N.C. App. at 512, 740 S.E.2d at 928 (holding that an unenforceable contract cannot support a claim for tortious interference with contract); *Guiliani v. Duke Univ.*, No. 1:08CV502, 2009 U.S. Dist. LEXIS 44412, at *13 (M.D.N.C. May 19, 2009) (dismissing tortious interference claim under North Carolina law where plaintiff failed to show valid contract).

{44} The Court next addresses Plaintiff's allegations that Vision Georgia, Vision Raleigh and Lewis tortiously interfered with Lund's Employment Agreement.

{45} First, as noted above, it is axiomatic that there can be no tortious interference with contract if there is no breach of the contract upon which the tortious interference claim is based. *See Phelps Staffing, Guiliani, supra*. Thus, because the Court has concluded that Plaintiff's claims for breach of the covenants not to solicit customers, prospective customers, or employees, the covenant not to disclose trade secrets, the duty of loyalty provision, and the return of property provision must fail, the Court likewise concludes that Plaintiff's tortious interference claims based on the alleged breach of these same provisions should be dismissed.

{46} The Court has previously concluded that Plaintiff's claim for breach of the contract prohibition on Lund's use or disclosure of confidential information for two years after his employment termination should survive the Vision Defendants'

---

[11] The Court also notes that the economic loss rule is inapplicable to Plaintiff's claim for tortious interference with Kirk's contract because Lund's contractual duty not to solicit Plaintiff's employees expired in June 2010, nearly two years before Kirk's termination and the tortious conduct Plaintiff alleges in support of its claim.

Motion. Plaintiff has also alleged that Lund discussed his contractual obligations with Vision Raleigh, Vision Georgia, and Lewis, (Am. Compl. ¶ 87), and that Vision Raleigh, Vision Georgia, and Lewis encouraged and induced Lund to breach Lund's contractual obligations, (Am. Compl. ¶ 88). Plaintiff further alleges that such interference was wrongful and unjustified. (Am. Compl. ¶ 196.) The earliest interference Plaintiff alleges, however, occurred in September 2011, (Am. Compl. ¶ 84), after Lund's contractual obligations expired in June 2011. The Court therefore concludes that Plaintiff's claim for tortious interference with the two-year prohibition on Lund's use or disclosure of confidential information should also be dismissed.

{47} The Court last addresses Plaintiff's claim that the Vision Defendants tortiously interfered with Plaintiff's prospective contracts or business relations. Significantly, however, "[t]o state a claim for tortious interference with a prospective economic advantage, a plaintiff must allege: '(1) a specific potential contract between the Plaintiff and a third party exists . . . .'" *Akzo Nobel*, 2011 NCBC LEXIS 42, at *57 (quoting *Dalton v. Camp*, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001)); *see also DaimlerChysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (concluding plaintiff failed to establish likelihood of success where it failed to identify any contract that third party was induced not to enter with plaintiff). Here, Plaintiff has not identified a specific potential contract that the Vision Defendants intentionally induced a third party not to enter with Plaintiff. As a result, the Court concludes that Plaintiff's claim for tortious interference with prospective economic advantage should be dismissed.

{48} Based on the above, the Court concludes that Plaintiff's claim for relief sixteen for tortious interference should be dismissed with prejudice.

c.    <u>Fraud</u>

{49} For a fraud claim to withstand a motion for judgment on the pleadings, a plaintiff must allege the following essential elements:

> (1) a material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge of its falsity or in culpable ignorance of its truth; (4) that the misrepresentation was made with intention that it should be acted

upon; (5) that the recipient of the misrepresentation reasonably relied upon it and acted upon it; and (6) that there resulted in damage to the injured party.

*Rosenthal v. Perkins*, 42 N.C. App. 449, 451–52, 257 S.E.2d 63, 65 (1979).

{50} Plaintiff's claim for fraud is against Lund alone. Plaintiff alleges that (i) "Lund knowingly misrepresented . . . the status of accounts, subcontractor and vendor costs, customer information, requests for products, drawings and services, [and] status of sales"; (ii) "Lund misrepresented . . . that he had returned to [Plaintiff] its documents and property at or about the time of resignation knowing that representation was not true to the detriment[] of [Plaintiff]"; (iii) "Lund owed a duty to disclose and not misrepresent to [Plaintiff] facts related to its business"; and (iv) "[a]s a result of [Plaintiff's] reliance on Defendant Lund's misrepresentations and material omissions, [Plaintiff] has suffered damages." (Am. Compl. ¶¶ 189–92.)

{51} The Court concludes that Plaintiff's allegations are sufficient to state a valid claim for fraud. The Court further concludes that the economic loss rule does not bar Plaintiff's claim because the alleged contractual duties on which Defendants contend the fraud claim is premised either did not exist – in the case of Lund's alleged contractual duty to return Plaintiff's property acquired after June 2009 – or had expired before Lund's alleged fraudulent conduct occurred – in the case of Lund's contractual duty of loyalty. The Court therefore concludes that the Vision Defendants' Motion should be denied as to Plaintiff's fraud claim.

d. Misappropriation of Trade Secrets[12]

{52} To state a *prima facie* case for misappropriation of trade secrets, "a plaintiff must show that a defendant: '(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.'" *GE Betz, Inc. v. Conrad*, __ N.C. App. __, __, 752 S.E.2d 634, 649 (2013)

---

[12] The Court notes that the Vision Defendants do not contend that the economic loss doctrine bars Plaintiff's misappropriation of trade secrets claim.

(quoting N.C. Gen. Stat. § 66-155 (2011)). The North Carolina Trade Secrets Protection Act ("TSPA") defines a "trade secret" as

> business or technical information . . . that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3) (2014).

> 'Misappropriation' means acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret.

N.C. Gen. Stat. § 66-152(1) (2014).

{53} Plaintiff's claim for misappropriation of trade secrets is against all Vision Defendants. The Vision Defendants argue that Plaintiff's claim should be dismissed because Plaintiff failed to bind Lund to a confidentiality agreement and thus failed to make reasonable efforts to maintain the secrecy of the information Plaintiff claims constitutes its trade secrets. Our courts have held that the reasonableness of a plaintiff's efforts to maintain secrecy are "necessarily fact dependent" and that a trial court must "closely examine the circumstances surrounding the trade secret." *See Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *15 (N.C. Super. Ct. May 1, 2015).

{54} Here, Plaintiff alleges that it (i) limited access to trade secret information to selected groups of employees on a need-to-know basis, (Am. Compl. ¶ 21); (ii) protected access to the information through computer passwords, (Am. Compl. ¶ 21); (iii) implemented and maintained a confidentiality policy providing that "unauthorized use or disclosure of confidential information may result in discipline, including immediate discharge, prosecution or other available action," (Am. Compl. ¶¶ 21, 37); (iv) implemented and maintained an electronic communications policy permitting the company to monitor employee communications, in part, to protect

against unauthorized disclosure of company trade secrets, (Am. Compl. ¶ 44); (v) required employees to execute electronic communications agreements permitting management's access to employee electronic communications, (Am. Compl. ¶ 38); (vi) emphasized the importance of confidentiality of company information to its employees, (Am. Compl. ¶ 21); and (vii) required key employees to enter into employment contracts containing nondisclosure covenants restricting use and disclosure of the company's confidential and trade secret information, (Am. Compl. ¶ 21).

{55} The Court concludes that Plaintiff's asserted efforts to maintain the secrecy of its alleged trade secrets are consistent with what our courts have held to be reasonable and sufficient under the TSPA. *See, e.g., Sunbelt Rentals*, 2002 NCBC LEXIS 2, at *42 (denying summary judgment where an employee handbook mandated that certain business information be kept confidential, and plaintiff restricted access to customer information stored in computer databases to those authorized through access codes); *Koch*, 2015 NCBC LEXIS 45, at *16 (denying summary judgment where plaintiff maintained its confidential information in locked cabinets and kept the same password protected); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *32–33 (N.C. Super. Ct. Apr. 23, 2015) (denying summary judgment where plaintiff locked its facilities, maintained a password-protected database, and secured contractual commitments to protect confidential information). *Compare Edgewater Servs. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21, at *12–14 (granting summary judgment where confidential information was kept in an unlocked file room, accessible to anyone).

{56} The Vision Defendants do not contest, and the Court finds, that Plaintiff has otherwise stated a valid claim for misappropriation of trade secrets. Accordingly, the Court concludes that the Motion should be denied as to Plaintiff's claim for misappropriation of trade secrets.

e.      Unfair and Deceptive Trade Practices

{57} As noted above, although Plaintiff's unfair trade practices claim is alleged against all Defendants, the Vision Defendants only move for judgment on the

pleadings as to Plaintiff's claim against Lund. To state a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, Plaintiff must allege that "(1) [Lund] committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that [P]laintiff was injured thereby." *Strickland v. Lawrence,* 176 N.C. App. 656, 665, 627 S.E.2d 301, 307 (2006) (internal quotation marks and citation omitted). Plaintiff alleges that Lund's wrongful acts include:

> misappropriation of trade secrets, embezzlement of company funds, fraudulent scheme to divert business opportunities away from [Plaintiff], receipt of kickbacks, theft of company property to gain an unfair advantage, fraudulent representations regarding retention of property, . . . interference with Defendant Kirk['s] . . . legal obligations owed to [Plaintiff], and other deceptive unethical and unscrupulous conduct . . . .

(Am. Compl. ¶ 129.)

{58} The Court initially notes that the economic loss rule is inapplicable to bar Plaintiff's UDTP claim against Lund. Although the Vision Defendants are correct that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1[,]" *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.,* 139 N.C. App. 360, 368, 533 S.E.2d 827, 833 (2000) (internal quotation marks and citation omitted), they mischaracterize the allegations constituting Plaintiff's claim. Rather than allege conduct constituting a mere breach of contract, the Court finds Plaintiff's allegations address conduct separate and distinct from any contractual duties and thus the economic loss rule does not bar Plaintiff's UDTP claim.[13] *See, e.g., Akzo Nobel,* 2011 NCBC LEXIS 42, at *48 (to

---

[13] The Court notes that it is unclear whether the economic loss doctrine applies broadly to bar unfair and deceptive trade practices claims as a matter of law. North Carolina appellate courts have not expressly extended the doctrine to bar all such claims. Moreover, in *Coker v. DaimlerChrysler Corp.,* 172 N.C. App. 386, 617 S.E.2d 306 (2005), although the majority opinion did not reach the issue, now-Supreme Court Justice Hudson, in a dissenting opinion, rejected application of the economic loss rule to Chapter 75 claims because "'the economic loss rule is judicial, not legislative, and must give way to specific legislative policy pronouncement allowing damages for economic loss.'" *Id.* at 172 N.C. App at 406–07, 617 S.E.2d at 319 (Hudson, J., dissenting) (quoting National Consumer Law Center, *Unfair and Deceptive Trade Practices Manual,* S. 4.2.16.2 (6th Edition 2004), *aff'd per curiam,* 360 N.C. 398, 627 S.E.2d 461 (2006).

avoid economic loss rule, "a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract").

{59} The Court also recognizes that Lund was Plaintiff's employee and that "[the North Carolina Supreme Court] has held that [N.C. Gen. Stat. § 75-1.1] does not normally extend to run-of-the-mill employment disputes." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 710. Nevertheless, the Supreme Court has also observed that "the mere existence of an employer-employee relationship does not in and of itself serve to exclude a party from pursuing an unfair trade or practice claim." *Id.* North Carolina courts have upheld unfair and deceptive trade practices claims in the employment context "when an employee's conduct: (1) involved egregious activities outside the scope of his assigned employment duties, and (2) otherwise qualified as unfair or deceptive practices that were in or affecting commerce." *Id.* at 656, 548 S.E.2d at 710–11; *see Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308 (1999) (upholding Section 75-1.1 claim against former employee where employee had fiduciary duties and engaged in self-dealing business transactions).

{60} The Court concludes that Plaintiff's allegations here satisfy the standard set forth in *Dalton* and *Sara Lee*, and therefore, that Plaintiff's Section 75-1.1 claim against Lund based on these allegations should survive Defendants' 12(c) Motion. *See, e.g.*, *GE Betz*, __ N.C. App. at __, 752 S.E.2d at 651 (willful violation of ongoing employment duties violated Section 75-1.1); *see also Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 57, 714 S.E.2d 162, 168 (2011) (where individual defendant engaged in self-dealing, his status as an employee did not bar Section 75-1.1 claim).

{61} In addition, Plaintiff alleges that Lund's misappropriation of trade secrets constitutes a violation of Section 75-1.1. Our Court of Appeals has stated that "[a] violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659, 670 S.E.2d 321, 329 (2009); *see also GE Betz*, __ N.C. App. at __, 752 S.E.2d at 650–51 (employee's misappropriation of employer's trade secrets constituted violation of Section 75-1.1). Because the Court concludes that Plaintiff

has stated a valid claim for misappropriation of trade secrets against Lund, Plaintiff's Section 75-1.1 claim against Lund based on this same conduct must also survive the Vision Defendants' Motion. *See Akzo Nobel*, 2011 NCBC LEXIS 42, at \*65 (declining to dismiss Section 75-1.1 claim because predicate misappropriation claim survived Rule 12(b)(6) dismissal).

{62}    Notwithstanding the above, because the Court has concluded that Plaintiff's claim against the Vision Defendants for tortious interference with Kirk's employment agreement should be dismissed, Plaintiff's Section 75-1.1 claim against Lund based on this same conduct should likewise be dismissed. *See Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 374, 555 S.E.2d 634, 642 (2001) (trial court properly dismissed Section 75-1.1 claim based on tortious interference with contract when court dismissed tortious interference claim).

f.    Breach of Fiduciary Duty[14]

{63}    Plaintiff's breach of fiduciary duty claim is against Lund. "A claim for breach of fiduciary duty requires the existence of a fiduciary duty." *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 247, 567 S.E.2d 781, 786 (2002). Generally, an employee does not owe a fiduciary duty to his employer because the relationship is not considered confidential. *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708. "Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the 'improper influences or domination of [its] employee.'" *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at \*16 (N.C. Super. Ct. Oct. 19, 2007). North Carolina courts have only found the special circumstances necessary for a fiduciary relationship between an employer and employee "when one party figuratively holds all the cards" such as "all the financial power or technical information." *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 475, 675 S.E.2d 133, 138 (2009) (internal quotation marks and citation omitted).

---

[14] The Court notes that the Vision Defendants do not contend that the economic loss doctrine bars Plaintiff's claim for breach of fiduciary duty.

{64}   Plaintiff has alleged that "Defendant Lund . . . held [a position] of trust and confidence within the company and exercised substantial [dominion] and control over [Plaintiff's] operations." (Am. Compl. ¶ 184.) Plaintiff has not alleged facts, however, that support its claim that Lund exercised dominion or influence over Plaintiff, that his solicitation of clients and collection of monies from clients caused him to "hold all the cards" in his relationship with Plaintiff, or that the relationship between Plaintiff and Lund involved something other than the typical employer-employee relationship.

{65}   In the absence of such facts, Plaintiff has failed to allege the "extraordinary or special type of employer-employee relationship that gives rise to a fiduciary duty" or that Lund "enjoyed the sort of domination or influence over [Plaintiff] that our courts have found necessary to create a fiduciary duty." *DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at *22 (N.C. Super. Ct. May 12, 2015) (dismissing breach of fiduciary duty claim) (citing *Dalton*, 353 N.C. at 653, 548 S.E.2d at 708; *Sunbelt Rentals*, 2002 NCBC LEXIS 2, at *21–22; *Austin Maint. Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 409–10, 742 S.E.2d 535, 542 (2012)); *compare Sara Lee*, 351 N.C. at 29–30, 519 S.E.2d at 310 (holding defendant "owed a fiduciary duty to Sara Lee with respect to his role in recommending the purchase and ordering of computer parts and related services for Sara Lee" where defendant was "authorized and entrusted to order and purchase computer parts at the lowest possible prices").

{66}   Accordingly, the Court concludes that Plaintiff's fourteenth claim for relief for breach of fiduciary duty against Lund should be dismissed with prejudice.

IV.

DEFENDANT LUND'S MOTION TO STRIKE

{67}   The Court next addresses Lund's Motion to Strike Plaintiff's reply brief and the accompanying affidavits supporting Plaintiff's Partial Summary Judgment Motion. Plaintiff's Partial Summary Judgment Motion was accompanied by the supporting affidavit of Plaintiff's President, Randy Scott. In his response brief opposing the Partial Summary Judgment Motion, Lund argues that an e-mail from Scott to Lund demonstrates that Lund did not have lawful possession of invoice

payments, and therefore could not be guilty of larceny or embezzlement. In order to respond to Lund's argument, and to contradict Lund's interpretation of that e-mail, Plaintiff filed its reply brief, accompanied by a supplemental second affidavit from Scott clarifying his e-mail statement, as well as other affidavits to similar effect that were not attached to the original Motion.

{68} Lund argues that North Carolina Rules of Civil Procedure 6(d) and 56(c) require that all supporting affidavits must be filed with the original motion. Therefore, according to Lund, Plaintiff's reply brief and supporting affidavits were improper and should be stricken.

{69} Rule 6(d) provides that "[w]hen a motion is supported by an affidavit, the affidavit shall be served with the motion . . . ." N.C. R. Civ. P. 6(d) (2014). Rule 56(c) does not mention supporting affidavits. *See* N.C. R. Civ. P. 56(c). Rather than support Plaintiff's Motion, however, the contested affidavits are offered in support of Plaintiff's reply and address issues that were raised for the first time in Lund's opposition. Neither Rule 6(d) nor Rule 56(c) addresses when reply affidavits must be filed. Although the Court has not been able to locate a North Carolina state court decision on point, a North Carolina federal court has concluded that affidavits offered in reply to the non-moving party's opposition may be served with the reply, as Plaintiff did here, and are not required to be filed with the motion, as Lund contends is mandatory. *See McGinnis v. Se. Anesthesia Assocs., P.A.*, 161 F.R.D. 41, 42 (W.D.N.C. 1995) ("[B]ecause the contested affidavits in the case at bar do not support the Defendant's motion, but rather support the reply, [Federal] Rule 6(d) does not prohibit them from being filed subsequent to the motion as reply affidavits."). The Court finds the reasoning in *McGinnis* persuasive[15] and concludes that Plaintiff's reply brief and supporting affidavits do not violate Rules 6(d) or 56(c). As a result, the Court concludes that Lund's Motion to Strike should be denied.

---

[15] The Court observes that "[d]ecisions under the federal rules are . . . pertinent for guidance and enlightenment in developing the philosophy of the North Carolina rules." *Turner v. Duke Univ.*, 325 N.C. 152, 164, 381 S.E.2d 706, 713 (1989).

V.

PLAINTIFF'S PARTIAL SUMMARY JUDGMENT MOTION

A.     Legal Standard

{70}   Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).  "When the plaintiff moves for summary judgment, plaintiff must establish that the facts as to each essential element of his claim are in his favor and that there is no genuine issue of material fact with respect to any essential element."  *Deans v. Layton*, 89 N.C. App. 358, 362, 366 S.E.2d 560, 563 (1988).

B.     Analysis

{71}   Plaintiff seeks summary judgment against Lund on Plaintiff's claim for civil liability for theft by employee or embezzlement under N.C. Gen. Stat. § 1-538.2, which provides that "[a]ny person . . . who commits an act that is punishable under G.S. 14-72, 14-72.1, 14-74, 14-90, or 14-100 is liable for civil damages to the owner of the property."  Plaintiff seeks to hold Lund liable for larceny by employee under N.C. Gen. Stat. § 14-74 and for embezzlement by virtue of employment pursuant to N.C. Gen. Stat. § 14-90 as the predicate violations for its claim under Section 1-538.2.

{72}   An element of both Section 14-74 and Section 14-90 is lawful possession of the employer's property.  *See State v. Brown*, 56 N.C. App. 228, 231, 287 S.E.2d 421, 424 (1982) ("Larceny by an employee requires *lawful* possession."); *State v. Speckman*, 326 N.C. 576, 578, 391 S.E.2d 165, 166 (1990) ("This Court has held that to constitute embezzlement, the property in question initially must be acquired lawfully . . . .").  Plaintiff has put forth evidence, and Lund does not deny, that Lund wrongfully accepted customer payments.  Lund argues, however, that he did not violate either Section 14-74 or Section 14-90 as a matter of law because he never "lawfully possessed" the customer payments.  Lund contends that Plaintiff's company policy, as indicated in an e-mail from Scott to Lund, is "that all payments be made directly to the company."  (First Scott Aff. Ex. 1.)   Based on this policy, Lund argues

that he did not lawfully possess the customer payments he accepted because he was not authorized to possess customer payments intended to satisfy Plaintiff's invoices.

{73} In making this argument, however, Lund relies on a technical reading of the phrase "directly to the company" that the Court finds is inconsistent with the plain meaning of the phrase when it is read in context. Rather than suggest the location where customer payments must be made, as Lund contends, the Court concludes that the phrase, as used in Scott's e-mail, unambiguously explains that customers must satisfy their invoices by making direct payments to Plaintiff rather than by making payments to an intermediary who has agreed to make payments to Plaintiff on the customer's behalf.

{74} The Court's construction is supported by the undisputed evidence of record. Not only is it undisputed that Lund was authorized to collect customer payments on Plaintiff's behalf, (*see* First Scott Aff. ¶ 3) ("Lund was entrusted and given responsibility for collecting payments from customers for production and services provided to them by [Plaintiff]."), but Scott's e-mail's plain meaning is consistent with the only evidence proffered bearing on Scott's intent. (*See* Randy Scott Aff., hereafter "Second Scott Aff.", ¶ 10, Feb. 17, 2015.) ("By using the word 'directly' [in the e-mail to Lund] I did not mean that Mr. Lund did not have authority to collect payments or accept checks from customers. Rather, I meant that our sales representatives were not to have customers write checks to them personally to satisfy [Plaintiff's] invoices.").

{75} The Court therefore concludes that the facts of record establish as a matter of law that Lund, as Plaintiff's sales representative, had the authority to collect customer payments on behalf of Plaintiff, and therefore lawfully possessed these payments. *See State v. McCaskill*, 47 N.C. App. 289, 293, 267 S.E.2d 331, 333 (1980) (where the defendant sales agent received money from customers that was to be delivered to the defendant's principal, and the defendant did not so deliver, the evidence established each element of the offense of embezzlement).

{76} Lund also contends that he could not have committed larceny by employee under Section 14-74 because the checks made payable to Lund were always the

customers' property, and never became Plaintiff's "property." Lund relies on *State v. Palmer*, 175 N.C. App. 208, 622 S.E.2d 676 (2005) and *State v. Weaver*, 359 N.C. 246, 607 S.E.2d 599 (2005) for his argument, contending that these cases establish that checks made payable to Lund did not constitute Plaintiff's property under Section 14-74 as a matter of law. The Court finds neither case controlling nor persuasive. In particular, neither *Palmer* nor *Weaver* discusses or cites Section 14-74, and the Court does not find either case concerned facts analogous to those here.

{77} Moreover, although Lund correctly asserts that one of the elements of the crime of larceny by employee is that the employer must be the owner of the stolen property at issue, *see State v. Frazier*, 142 N.C. App. 207, 209, 541 S.E.2d 800, 801 (2001) (requiring for violation of Section 14-74 that "the defendant was an employee of the owner of the stolen goods"), the Court concludes that Plaintiff was the owner of the stolen property here as a matter of law. North Carolina courts have held that "[c]hecks made payable to the order of an agent, which are cashed by him[,] are not different from payments made in cash so far as the legal effect of the transaction is concerned." *Sentry Enters., Inc. v. Canal Wood Corp.*, 94 N.C. App. 293, 299, 380 S.E.2d 152, 156 (1989) (quoting *Haynes Petroleum Corp. v. Turlington*, 261 N.C. 475, 477, 135 S.E.2d at 45–46 (1964)). In addition, it would appear clear on the facts of record that Plaintiff would be bound under agency principles by its customers' payments to Lund. *See Haynes*, 261 N.C. at 478, 135 S.E.2d at 46 ("No duty rests upon a debtor, who makes a payment to an agent designated to receive it, to see that the money reaches the principal, if the debtor is without notice of an improper purpose or intention on the part of the collecting agent."); *see also Raulie v. Jackson-Horne Grocery*, 48 N.M. 556 (1944) (where an agent accepted payment from his principal's customer and was to deliver payment to the principal, the principal was bound to the customer's payment, even though the agent misappropriated the customer's payment). Although the Court's research has not located a court decision directly on point, it follows from these propositions that at the time the payments were made to Plaintiff's agent Lund, in lawful satisfaction of the customers' debts to Plaintiff, the funds then became Plaintiff's "property" for purposes of larceny by

employee under N.C. Gen. Stat. § 14-74 in the absence of Plaintiff's agreement to transfer the funds to Lund.

{78} Accordingly, the Court concludes that Plaintiff's Partial Summary Judgment Motion should be granted and that judgment should be entered for Plaintiff as to Lund's liability on Plaintiff's claim for civil liability for theft by employee or embezzlement under N.C. Gen. Stat. § 1-538.2.

VI.

CONCLUSION

{79} Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** the Vision Defendants' Motion for Judgment on the Pleadings as follows:

A. The Vision Defendants' Motion for Judgment on the Pleadings as to Plaintiff's eighth (breach of duty of loyalty provision), tenth (breach of covenant not to solicit customers), eleventh (breach of covenant not to solicit prospective customers), twelfth (breach of return of property provision), thirteenth (breach of covenant not to solicit employees), fourteenth (breach of fiduciary duty), fifteenth (fraud), and sixteenth (tortious interference) claims for relief is **GRANTED**. These claims are hereby **DISMISSED** with prejudice.

B. The Vision Defendants' Motion for Judgment on the Pleadings as to Plaintiff's third (N.C. Gen. Stat. § 66-152), and ninth (breach of confidentiality and non-disclosure covenant) claims for relief is **DENIED**.

C. The Vision Defendants' Motion for Judgment on the Pleadings as to Plaintiff's second claim for relief (N.C. Gen. Stat. § 75-1.1) against Lund is **GRANTED** to the extent Plaintiff's second claim for relief against Lund is based on Plaintiff's claim for tortious interference with Kirk's employment; otherwise, the Vision Defendants' Motion for Judgment on the Pleadings as to Plaintiff's second claim for relief against Lund is **DENIED**.

{80} The Court hereby **DENIES** Lund's Motion to Strike, **GRANTS** Plaintiff's Partial Summary Judgment Motion, and **ENTERS JUDGMENT** for Plaintiff as to Lund's liability on Plaintiff's first claim for relief for civil liability for theft by employee or embezzlement under N.C. Gen. Stat. § 1-538.2. Plaintiff's damages on its first claim for relief shall be determined through subsequent motions practice or at trial.

**SO ORDERED**, this the 9th day of December, 2015.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases